

**FILED**

**Margaret Botkins**
**Clerk of Court**

*11:18 am, 7/15/22*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

FIRST INTERSTATE BANCSYSTEM,
INC. and FIRST INTERSTATE BANK,

Plaintiffs,

vs.                                                    Case No.  021-CV-0067

DAVID HUBERT ET AL.,

Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT BY DEFENDANTS HUBERT, CHRISTENSEN, AND MARTINSON, AND GRANTING MOTIONS FOR SUMMARY JUDGMENT BY DEFENDANTS McCOMB, DICK, NEWMAN, AND PHELPS**

---

This matter is before the Court on Motions for Summary Judgment filed by Defendants Hubert, Christensen, McComb, Martinson, Dick, Newman, and Phelps (collectively, Defendants). ECF 85, 86, 87, 88, 89, 90, 91.  Defendants argue Plaintiffs (collectively, "FIB") have no evidence that any Defendant engaged in any wrongdoing, and that FIB's contract and misappropriation-based tort theories are, as a legal matter, fatally flawed.  FIB argues there are material facts in dispute which preclude summary judgment and that all of their claims are supported by law.

For the reasons that follow, the Court concludes there is no triable issue of disputed fact concerning whether Defendants improperly acquired or misappropriated trade secrets, or breached FIB's Code of Conduct by using or sharing confidential information beyond

legitimate FIB business purposes or by forwarding confidential information to personal email accounts.  The Court also concludes there is no triable issue of disputed fact concerning whether Defendant McComb breached a duty of loyalty to FIB.

Finally, the Court concludes there is no triable issue of disputed fact concerning whether Defendants used misappropriated confidential information about FIB customers in their new positions to induce those customers to terminate or reduce the scope of their business relationship with FIB needs, nor is there any triable issue of disputed fact concerning whether Defendants made misrepresentations to current FIB clients and FIB's business partners that FIB would be sold and/or leave the market.

Consequently, the Court grants the motions for summary judgment filed by Defendants McComb, Dick, Newman and Phelps, and grants in part and denies in part the motions for summary judgment filed by Defendants Hubert, Christensen, and Martinson. The only remaining claim in the case is FIB's Third Claim for Relief (breach of loyalty) against Defendants Hubert, Christensen, and Martinson.

<u>Background</u>

Prior to identifying what are considered to be undisputed facts, the Court notes that the briefing contains conclusory and argumentative statements in the "undisputed facts" sections.[1]  Even considering the facts in the lights most favorable to FIB, the Court will not and is not required to accept or consider statements which are conclusory or argumentative.

---

[1] FIB's combined response to the Defendants' separate statements of fact is difficult to follow for which of Defendants' facts it disputes.  Where the Court can see FIB directly disputes a fact assertion, it is noted as such below.  Defendants also did not help the Court's task by e-filing non-searchable briefs, declarations and exhibits.

*Undisputed Facts – All Defendants*

As previously explained (ECF 136), FIB is a financial institution, and all seven Defendants were at-will employees at FIB's Sheridan branch until their resignations on March 22, 2021 when they began working for Glacier Bank, which is also referred to in pleadings as First Bank (herein, "Glacier").  ECF 41, pp. 2-4.

Around May 2019, FIB published a Code of Conduct. ECF 1-1; ECF 41, p. 3.  All Defendants signed FIB's Code of Conduct, although no additional separate consideration was provided in exchange for their signatures.  ECF 41, p. 3.  All Defendants have the right to lawfully compete for banking business against FIB. *Id*. at 4.

Under a heading entitled "Keep Private Information Private," the Code of Conduct states in relevant part:

> . . .  Information we gather, process, store, or transmit about First Interstate clients, employees, business partners, and others is considered to be Interstate property.  We are responsible for keeping confidential information safe and secure.

> - Use confidential information only for legitimate Company business purposes and not for your personal gain or to compete with First Interstate.

> - Keep employees' and clients' personal information safe and secure and only share it with those who have a legitimate company business need to know.

> - Don't share customer information with anyone inside or outside the Company unless there is a business need for doing so or unless it's required by law.
>
> . . .

> - Don't forward confidential information to personal email accounts. Remember, all email is monitored by the Company. . . .

ECF 1-1, p. 14.

FIB alleges it first learned of Defendants' departure when they submitted their resignations on March 22, 2021.  ECF 104, p. 7.  While it is not uncommon for employees in the financial services industry to transition from one employer to another on the same day, the fact that Defendants resigned at the same time to join Glacier was uncommon and immediately raised suspicions by FIB that the departure was coordinated.  ECF 41, p. 4; ECF 104, p. 2.  Steve Crow, Hubert's successor, began working at the Sheridan branch on March 22, 2021 to assist FIB in the wake of constraints in FIB's ability to most effectively service customers because of Defendants' departures that day.  *Id*.  According to FIB, Defendants' departures left the FIB branch with virtually no employees to provide services to its commercial customers and to train new hires. ECF 104, p. 4.

As to the misappropriation-related claims, FIB has identified 85 documents that FIB claims Defendants printed shortly before they left FIB. ECF 92, p. 8.

### *Undisputed Facts – Defendant Hubert*

1. Until March 22, 2021, Hubert was the Market President for Northern Wyoming and Senior Vice President of FIB. ECF 41, p. 2.

2. In April or May, 2020, Hubert learned from his supervisor (FIB Regional President David Bruni) that Glacier was considering a new branch in Sheridan.  According to Hubert, he was dissatisfied with FIB's management and direction and its alignment with his career goals and philosophy.  He knew Christensen was also dissatisfied and was considering an immediate resignation, so Hubert told Christensen that he knew of a potential new bank opening, which Hubert referred to as a "Plan B" if conditions at FIB didn't improve. ECF 94, p. 4 (citing Hubert Dec., ECF 87-1).

4

3. In June 2020, Hubert obtained a contact at Glacier and began a series of meetings about Glacier, including to discuss potential employment.  Through the course of discussions with Glacier, Hubert learned that Christensen, McComb, Martinson and Dick were also communicating with Glacier or considering potential employment with Glacier.  Hubert even participated in two meetings with Glacier and some of these FIB employees. *Id*., pp. 4-5.

4. During the summer of 2020, Hubert shared three different potential locations for the Glacier branch with a Glacier representative. ECF 104, pp. 4-5.

5. In October, 2020, Hubert, McComb, and Christiansen took Glacier representatives on a ride around Sheridan. Later in October, Christensen, Hubert and McComb met for dinner at Christensen's home with several Glacier executives, and the executives informed these Defendants they wanted to open a branch in Sheridan.  *Id*., p. 5.

6. On a few occasions when Hubert's supervisor Bruni asked Hubert whether FIB was at risk of losing employees, Hubert did not tell Bruni that he and others were engaged in discussions with Glacier.  However, Bruni knew Hubert was concerned the commercial team was unhappy and FIB had a risk of turnover. Another credit officer (Destefano) also knew others on the commercial team were frustrated and unhappy with the new loan approval process. ECF 94, p. 5.

7. FIB claims Hubert printed three documents shortly before he left FIB. *Id*., p. 8.  By sworn declaration, Hubert testified to the documents he printed, the reasons why one of the documents was printed for legitimate FIB business purposes, and that the other two which he brought with him when he left FIB employment were documents relating to

a loan Hubert had personally made to a prospective customer to whom FIB had declined to extend credit.  Hubert explains that those two documents are not FIB documents, but documents for the loan he had personally made. *Id*., pp. 8-9.  FIB disputes that Hubert had any legitimate FIB business purposes in printing the documents.  ECF No. 104 at pp. 11-12.  It also disputes that he did not take the documents after he left FIB; to the contrary, FIB "inspected Defendants' offices shortly after their departure and, with one exception, none of the documents they printed were left in their offices."  *Id.* at p. 15.

8. On March 6, 2021, Hubert learned there was a branch manager opening at Glacier and he applied for it. On March 8, 2021, he was offered the position subject to a background check. On March 11, 2021, Hubert accepted the conditional offer with Glacier. Around that same time Hubert learned that Christensen, McComb, Martinson and Dick had also accepted conditional employment offers from Glacier. ECF 94, p. 6.

9. Beginning March 19, 2021 and over the weekend, Hubert's supervisor Bruni tried to reach Hubert by telephone and text, and Hubert assumed the purpose was to confront him about the situation.  The next day, Hubert met with Christensen, Martinson, Dick, Newman, Phelps, and another FIB employee at Hubert's home to discuss their concerns that FIB management had learned about their intended departures and would terminate them.  They decided to submit their resignations the next day. *Id*., p. 6.

*Undisputed Facts – Defendant Christensen*

1. Until March 22, 2021, Christensen was an employee of FIB. Christensen held the position of Commercial Group Manager II and Vice President of FIB.  ECF 41, p. 2.

6

2.  Christensen began considering leaving FIB in the spring of 2020 for several reasons including her frustration with changes to FIB's loan approval process and her feelings that her job wasn't enjoyable and she no longer felt valued. ECF 92, p. 4 (citing Christensen Dec., ECF 85-1).   At that time, Christensen learned from her direct supervisor, Hubert (who knew she was dissatisfied), that Glacier was considering a new branch in Sheridan, and they discussed that, if things did not improve at FIB, Glacier could serve as a "Plan B." *Id*.   An FIB credit officer knew Christensen was frustrated with FIB's new lending model and process for loan approval and the delays it was causing. *Id*. at p. 5.

3.  In July 2020, McComb talked to Christensen about employment possibilities with Glacier, and a few weeks later, gave Christensen contact information for a Glacier representative. Christensen began her own discussions with Glacier about potential employment. *Id*., pp. 4-5.

4.  Thereafter, Christensen learned that Martinson and Dick were considering leaving. Christensen and McComb had lunch with Martinson and encouraged Martinson to be patient and hopefully things would improve at FIB.   They also talked about employment possibilities with Glacier. *Id*., p. 5.

5.  In October, 2020, Hubert, McComb, and Christiansen took Glacier representatives on a ride around Sheridan. Later in October, Christensen, Hubert and McComb met for dinner at Christensen's home with several Glacier executives, and the executives informed these Defendants they wanted to open a branch in Sheridan.  ECF 104, p. 5.

6.  FIB claims Christensen printed 17 documents shortly before she left FIB. ECF 92, p. 8.
    By sworn declaration, Christensen testified to the documents she printed and those she
    asked Phelps to print relating to Bighorn Airways, the reasons why the documents were
    printed for legitimate FIB business purposes, the disposition (by shredding) of the
    documents, and that she did not bring any documents with her or retain copies when
    she left FIB employment. *Id*., pp. 8-11.  FIB disputes that Christensen had any
    legitimate FIB business purposes in printing the documents.  ECF No. 104 at pp. 11-
    12.  It also disputes that she did not take the documents after she left FIB; to the
    contrary, FIB "inspected Defendants' offices shortly after their departure and, with one
    exception, none of the documents they printed were left in their offices." *Id.* at p. 15
    (citing ECF 82, Jensen Dec. ¶ 4(d)).[2]

7.  Over the next several months, some or all of Defendants Christensen, Hubert, McComb,
    Martinson and Dick had a series of meetings with Glacier representatives. ECF 92, p.
    5.

8.  Before a March 3, 2021, meeting with Glacier representatives at Glacier's Sheridan
    office, Christensen volunteered to bring other FIB lenders to the meeting. ECF 104, p.
    6.

9.  On March 10, 2021, Christensen applied for and received a job offer from Glacier. On
    March 16 and 17, 2021, Christensen told Newman and Phelps (along with another FIB
    employee) that she was likely to be leaving FIB. ECF 92, p. 6.

---

[2] The Jensen declaration states that a single page was found in one office, but does not identify whose office it was or the page in question.  FIB also cites ECF 106-19, Bruni Depo. p., 111-113, which discusses only Hubert and Christensen's former offices, and the Crow Depo. at 55, which concerns only Martinson's former office.

10. On March 20, 2021 and over that weekend, FIB Regional President David Bruni tried to reach Christensen by telephone and text, and Christensen assumed the purpose was to confront her about the situation.  The next day, Christensen met with Hubert, Martinson, Dick, Newman, Phelps, and another FIB employee at Hubert's home to discuss their concerns that FIB management had learned about their intended departures and would terminate them.  They decided to submit their resignations the next day. *Id.*, p. 6.

11. By sworn declaration (confirmed by sworn declaration of the Vice President of Bighorn Airways, Chris Eisele, ECF 122-4), Christensen did not inform Bighorn Airways that she was joining Glacier until after she left her employment with FIB. *Id.*, p. 11.[3] Bighorn Airways moved their loans from FIB to Glacier "solely based on what it believed was in its best interests, including its belief that Christensen and [Glacier] could provide it with the best service." *Id.*, p. 12 (citing Eisele Dec. ¶ 7).

*Undisputed Facts – Defendant McComb*

1. Until March 22, 2021, McComb was an employee of FIB. McComb held the position of Vice President at FIB. ECF 41, p. 2.

2. McComb began considering leaving FIB in August 2019, when he was informed that FIB was interviewing candidates for his replacement.  In April 2020, further troubled by the workload at FIB and its impact on his health and family life, McComb contacted

---

[3] The pages of depositions that FIB cites to disputes these facts do not controvert that Christensen only informed Bighorn Airways of her move after she left FIB.

Glacier as well as others about potential employment. The discussions with Glacier lasted over the next several months. ECF 96, p. 4 (citing McComb Dec., ECF 89-1).

3. In July 2020 and knowing Christensen was unhappy at FIB and considering other employment, McComb informed Christensen about the possibility of Glacier opening a new branch in Sheridan. The next month he provided Christensen with contact information for Glacier.  McComb also learned Hubert had been in contact with Glacier, and that Martinson was considering leaving FIB. They all had lunch to discuss issues at FIB, possible solutions, and the Glacier possibilities.  *Id*.

4. In August or September 2020, Glacier asked McComb to get them resource information which he understood as needing to determine the feasibility of opening a branch in Sheridan. ECF 104, p. 5.

5. In October 2020, Hubert, McComb, and Christiansen took Glacier representatives on a ride around Sheridan. Later in October, Christensen, Hubert and McComb met for dinner at Christensen's home with several Glacier executives, and the executives informed these Defendants they wanted to open a branch in Sheridan.  ECF 104, p. 5.

6. In October 2020 and knowing Dick was also dissatisfied at FIB, McComb mentioned the possibility of Glacier opening a new branch.  McComb also suggested to Dick that he explore an internal job posting with the FIB Home Loans Division. ECF 96, p. 5.

7. FIB claims McComb printed two documents shortly before he left FIB. *Id*., p. 8.  By sworn declaration, McComb testified to the documents he printed, the reasons why the documents were printed for legitimate FIB business purposes, the disposition of the documents (he left them in his office at FIB), and that he did not bring those documents

with him or retain copies when he left FIB employment. *Id*., pp. 8-9. FIB disputes that McComb had legitimate FIB business purposes for printing the documents. ECF No. 104 at pp. 11-12.  It also disputes that he did not take the documents after he left FIB; to the contrary, FIB "inspected Defendants' offices shortly after their departure and, with one exception, none of the documents they printed were left in their offices." *Id.* at p. 15.

8.  McComb accepted a contingent employment offer from Glacier on March 8, 2021 and, on March 10, 2021, learned from Christensen that Martinson and Dick were also accepting positions at Glacier. ECF 96, p. 5.

9.  By March 19, 2021, McComb had decided to submit his resignation from FIB on March 22, 2021.  McComb was not present at the meeting at Hubert's home.  McComb had worked in the FIB Home Lending group, which has a separate reporting line from the Commercial Lending Group that included Defendants Hubert, Christensen, Martinson, Dick, Newman, and Phelps. *Id.*

***Undisputed Facts – Defendant Martinson***

1.  Until March 22, 2021, Martinson was an employee of FIB. Martinson held the position of Assistant Vice-President of FIB. ECF 41, p. 2.

2.  In 2019, Martinson became unhappy with FIB's changed approach to local control of banking decisions and resolved to seek other employment.  He received a number of job offers during this time. An FIB credit officer knew Martinson was frustrated with FIB's new centralized lending model and process for loan approval and the delays it was causing. ECF 95, p. 4 (citing Martinson Dec., ECF 88-1).

3. On December 3, 2020, Martinson first had contact with Glacier through a Zoom call which also included Dick and Christensen.  The discussions on the call concerned Glacier's credit culture, bank structure, and employment potential. *Id.*

4. FIB claims Martinson printed 12 documents shortly before he left FIB. *Id.*, p. 8.  By sworn declaration, Martinson testified to the documents he printed, the reasons why the documents were printed for legitimate FIB business purposes, and that he did not bring those documents with him or retain copies when he left FIB employment. *Id.*, pp. 7-8. FIB disputes that Martinson had legitimate FIB business purposes for printing the documents.  ECF No. 104 at pp. 11-13.  It also disputes that he did not take the documents after he left FIB; to the contrary, FIB "inspected Defendants' offices shortly after their departure and, with one exception, none of the documents they printed were left in their offices." *Id.* at p. 15.

5. On March 6, 2021, Martinson applied for a position with Glacier and received a conditional job offer on March 8, 2021, which he accepted on March 10, 2021. Martinson was on vacation in Mexico after then and didn't return until the evening of March 20, 2021. ECF 95, p. 5.

6. On March 21, 2021, Martinson met with Hubert, Christensen, Dick, Newman, Phelps, and another FIB employee at Hubert's home to discuss their concerns that FIB management had learned about their intended departures and would terminate them. They decided to submit their resignations the next day. *Id.*, p. 5.

***Undisputed Facts – Defendant Dick***

1. Until March 22, 2021, Dick was an employee of FIB and a member of the commercial banking unit in Sheridan, Wyoming. Dick held the position of Commercial Relationship Manager II. ECF 41, p. 2.

2. In late 2019 and early 2020, Dick began seeking other employment opportunities when he became dissatisfied with FIB's philosophy and culture and his role within the company. ECF 93, pp. 3-4 (citing Dick Dec., ECF 86-1).

3. Because Dick wanted to continue working with his colleague and friend Martinson, they had several conversations about other employment opportunities, and both reached out to some of the same businesses. *Id*., p. 4.

4. Dick heard from Christensen about possible employment at an undisclosed bank if the situation at FIB didn't change and if Dick wished to leave.  Dick heard about Glacier from McComb, who knew about Dick's dissatisfaction at FIB. *Id*.  Dick also learned that Christiansen, Hubert, and McComb were scouting out a potential site in Sheridan for the Glacier branch. ECF 104, p. 4.

5. In December 2020, Dick began discussions with Glacier through a Zoom call which also included Martinson and Christensen.  Dick's discussions with Glacier continued over the next few months. *Id*.

6. FIB claims Dick printed nine documents shortly before he left FIB.  ECF 93, p. 7.  By sworn declaration, Dick testified to the documents he allegedly printed, the reasons why the documents were printed for legitimate FIB business purposes, and that, with one exception, he did not bring those documents with him or retain copies when he left FIB

employment. Dick testified to the document he took with him for future reference, stating he removed client-identifying information before he printed it, and that he created the document in the first instance. *Id*., pp. 7-8. FIB disputes that Dick had legitimate FIB business purposes for printing the documents. ECF No. 104 at 11-12, 14-15. It also disputes that he did not take any of the documents after he left FIB; to the contrary, FIB "inspected Defendants' offices shortly after their departure and, with one exception, none of the documents they printed were left in their offices." *Id.* at 15.

7. Dick applied for a position at Glacier on March 6, 2021 and received a conditional offer of employment on March 8, 2021 which included the potential for more money than he was making at FIB. Dick accepted the offer on March 10, and his background check was completed March 17, 2021. ECF 93, pp. 4-5.

8. On March 21, 2021, Dick met with Hubert, Christensen, Martinson, Newman, Phelps, and another FIB employee at Hubert's home to discuss that FIB management was seeking to contact Hubert and Christensen, presumably about their impending departure, and that Hubert and Christensen believed FIB intended to terminate them on Monday. Dick also believed that he would be terminated and decided to submit his resignation the next day. *Id*., p. 5.

9. Dick testified when he received the pre-litigation demand letter from FIB to destroy any copies of FIB documents in his possession, he complied and destroyed the one document he had. *Id*., p. 8.

*Undisputed Facts – Defendant Newman*

1. Until March 22, 2021, Newman was an employee of FIB and a member of the commercial banking unit in Sheridan, Wyoming. Newman held the position of Commercial Relationship Manager. ECF 41, p. 3.

2. FIB claims Newman printed five documents shortly before he left FIB. ECF 97, p. 7 (citing Newman Dec., ECF 90-1).  By sworn declaration, Newman testified to the documents she allegedly printed, the reasons why the documents were printed for legitimate FIB business purposes, and that she did not bring any of those documents with her or retain copies when she left FIB employment. *Id*., pp. 6-8.  FIB disputes that Newman had legitimate FIB business purposes for printing the documents.  ECF No. 104 at pp. 11-12, 15-16.  It also disputes that she did not take any of the documents after she left FIB; to the contrary, FIB "inspected Defendants' offices shortly after their departure and, with one exception, none of the documents they printed were left in their offices." *Id.* at p. 15.

3. On March 16, 2021, Newman's manager (Christensen) told her that she (Christensen), Hubert and McComb were planning to leave FIB and join Glacier, and that Martinson and Dick were considering offers from Glacier.  Newman was told by Christensen that, with these departures, Newman would have opportunities at FIB, and that she might have opportunities at Glacier as well.  Later that evening Newman spoke with Hubert who told her the same things.  Before March 16, 2021, Newman was unaware that anyone was considering leaving FIB for Glacier, or that she would have any opportunities at Glacier. ECF 97, pp. 3-4.

4. On March 16, 2021, Newman spoke to Phelps about the potential departures and the possibility of their own employment at Glacier. *Id*., p. 4.

5. On March 17, 2021, Newman applied for, received, and accepted an offer for a position with Glacier, and chose to leave FIB for Glacier because she was offered a salary increase. *Id*.

6. On March 21, 2021, Newman met with Hubert, Christensen, Martinson, Dick, Phelps, and another FIB employee at Hubert's home.  They discussed that FIB management was seeking to contact Hubert and Christensen, presumably about their impending departure, and that Hubert and Christensen believed FIB intended to terminate them on Monday.  Based on that, Newman decided to submit her resignation the next day. *Id*.

***Undisputed Facts – Defendant Phelps***

1. Until March 22, 2021, Phelps was an employee of FIB and a member of the commercial banking unit in Sheridan, Wyoming. Phelps held the position of Commercial Banking Representative. ECF 41, p. 3.

2. On March 16, 2021, Phelps' manager (Christensen) told Phelps that she (Christensen), Hubert and McComb were planning to leave FIB for Glacier, and that Martinson and Dick were considering offers from Glacier as well.  Phelps learned from Christensen that, with these departures, she would have opportunities at FIB, and that she might have opportunities at Glacier as well.  Phelps texted Newman about the opportunity at Glacier.  Prior to this conversation, Phelps was unaware of any departures from FIB, or any opportunities at Glacier. ECF 98, pp. 3-4 (citing Phelps Dec., ECF 91-1).

3. FIB claims Phelps printed 37 documents shortly before she left FIB. *Id.*, p. 6.  By sworn declaration, Phelps testified that one of the documents was printed two weeks before she was aware of any possible job with Glacier.  She further testified to the other documents she allegedly printed, the reasons why the documents were printed for legitimate FIB business purposes, and that she did not bring any of those documents with her or retain copies when she left FIB employment. *Id.*, pp. 6-10.  FIB disputes that Phelps had legitimate FIB business purposes for printing the documents.  ECF No. 104 at pp.11-12.  It also disputes that she did not take any of the documents after she left FIB; to the contrary, FIB "inspected Defendants' offices shortly after their departure and, with one exception, none of the documents they printed were left in their offices." *Id.* at p. 15.

4. On March 17, 2021, Phelps applied for, received, and accepted an offer for a position with Glacier, and chose to leave FIB for Glacier because she was offered a salary increase and, being five months pregnant, she thought it would better benefit her family. ECF 98, p. 4.

5. On March 21, 2021, Phelps briefly attended a meeting at Hubert's home with Hubert, Christensen, Martinson, Dick, Newman, and another FIB employee who was leaving FIB for Glacier.  Phelps does not recall anyone discussing when they planned to leave FIB during the brief time she was there, and she had already decided to submit her resignation the next day. *Id.*

<u>Applicable Legal Standards</u>

The Court shall grant a motion for summary judgment if the movant has demonstrated that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014) (citing *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013)).

In considering a motion for summary judgment, the moving party has the burden of production and the burden of establishing that summary judgment is appropriate as a matter of law. *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010). If the movant does so, the nonmovant "must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)). To defeat a motion for summary judgment, the non-movant must show more than "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position . . . there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "[E]vidence, including testimony, must be based on more than mere speculation, conjecture or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). Unsubstantiated conclusory allegations carry no probative weight in summary judgment proceedings and do not create a genuine issue of material fact. *Id.* (quoting *Phillips v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cir. 1992)). Finally, in ruling on a motion

for summary judgment, the Court may only consider evidence that can be presented at trial in a form that would be admissible in evidence — on a non-movant's objection, evidence whose content or substance cannot be presented in admissible form at trial should be disregarded.  Fed. R. Civ. P. 56(c)(2); *Johnson v. Weld Cty.*, 594 F.3d 1202, 1210 (10th Cir. 2010).

<u>Discussion</u>

1. **Statutory Misappropriation Claims under the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1832 et seq., and the Wyoming Uniform Trade Secrets Act (WUTSA), Wyo. Stat. §§ 40-24-101 et seq. (First and Second Claims)**

FIB claims each of the Defendants misappropriated its proprietary and confidential customer information by emailing confidential documents to their personal emails before leaving FIB, by printing confidential documents, and by retaining possession of the documents after leaving FIB, and that Defendants are using such information in the course of their employment with Glacier to their benefit and Glacier's benefit. ECF 1, pp. 8-10.

The parties agree that both the DTSA and the WUTSA provide similar protection to trade secrets and define "trade secret" and "misappropriation" similarly.  Consequently, the Court will focus its discussion on the DTSA.

The DTSA authorizes an owner of a trade secret that is misappropriated to bring a civil action "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). The statute defines what information may constitute a "trade secret" in detail; essentially it "is information that derives economic value from not being generally known that is subject to reasonable measures of secrecy by it[s] owners." *Select Energy Servs., Inc. v. Mammoth Energy Servs.,*

*Inc.*, No. CIV-19-28-R, 2019 WL 1434586, at *2 (W.D. Okla. Mar. 29, 2019) (citing 18

U.S.C. § 1839(3)). The statute defines misappropriation as:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who—
>
> (i)   used improper means to acquire knowledge of the trade secret;
>
> (ii)   at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
>
>> (I)   derived from or through a person who had used improper means to acquire the trade secret;
>>
>> (II)   acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>>
>> (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>
> (iii)   before a material change of the position of the person, knew or had reason to know that—
>
>> (I)   the trade secret was a trade secret; and
>>
>> (II)   knowledge of the trade secret had been acquired by accident or mistake[.]

18 U.S.C. § 1839(5). Thus, misappropriation is the acquisition, disclosure or use of a trade

secret with knowledge or reason to know it is unauthorized. *Id.*

Seeking judgment in their favor, Defendants argue that FIB cannot show that many

of the documents contain FIB trade secrets.  As to some of the documents, Defendants state

that FIB can neither identify nor produce certain documents it claims were printed.  Most

importantly, Defendants argue FIB cannot produce any admissible evidence from which a reasonable juror could find they "misappropriated" the documents.

Before turning to each individual Defendant and the documents printed, the Court will address FIB's argument that Hubert, Christensen, Newman, and Martinson used their remembered information about FIB's clients to solicit those clients. This allegation is made in the context of an at-will employment relationship without a non-compete agreement or a non-solicitation agreement. Therefore, the Defendants are free, upon leaving employment to use general knowledge, skills, and experience acquired while working for FIB to engage in competitive employment. However, Defendants remain under a duty not to use or disclose, to the detriment of the former employer, trade secrets acquired in the course of previous employment. This prohibition includes *memorized* trade secrets as the Court agrees with FIB that the nature of the trade secret acquisition – whether printed, copied, written down or memorized – is immaterial. What matters is whether the information meets the definition of a trade secret and, if so, whether the trade secret was illegally misappropriated to third parties.

FIB argues Christensen had deep knowledge of the specific terms of FIB's customer accounts, including deep knowledge of Bighorn Airways' account as well as in-depth knowledge about the customers handled by her subordinates. FIB also argues Hubert and Newman also used their remembered information to solicit FIB customers. Finally, FIB argues Martinson had intimate knowledge of customers' financial condition, circumstances, and business needs, and prepared a list of FIB customers (and for some,

amounts and some terms of loans), and solicited around twenty FIB customers to obtain their business for Glacier.[4]

In reply, Christensen argues FIB has no evidence that she solicited any customer, but merely communicated to them that she had left FIB and went to Glacier. As to Bighorn Airways specifically, its Vice President provided a sworn declaration to this effect. ECF 122-4. He further states that Bighorn Airways provided copies of banking documents to Christensen after she went to work for Glacier, and that its decision to enter a lending relationship with Glacier was based solely on Bighorn Airways best interests. *Id.* ¶¶ 6, 7. Further, Hubert states he had a general conversation with one client but informed that client shortly thereafter that Glacier was not interested in his business. ECF 116, p. 7. Newman states customers reached out to her about doing business together, and she solicited no one. ECF 119, p. 8. Martinson states several companies and individuals he contacted were not FIB clients, that he knew nearly all of them personally outside his work for FIB, and that the list did not reflect FIB loan terms but represented Martinson's estimations of those customers' *potential* business. ECF 117, pp. 5-6.

All four Defendants also argue FIB has no evidence to suggest the mere identities of the customers were trade secrets, and that many FIB borrowers and related loan terms are listed on commercially available reports (*e.g.,* S&P Global Market Intelligence records). ECF 122. Finally, Defendants argue that FIB's arguments sweep too broadly and

---

[4] FIB points out that Martinson told around twenty FIB customers that he was "starting a new bank and *if we can help you at some point in the future, we'd love to have the opportunity.*" ECF 104, pp. 25-26.

would basically allow FIB to benefit from a non-compete agreement which was never a part of Defendants' employment relationship with FIB.

In first considering whether the identity of a FIB customer is a trade secret, this case is unusual in that there is no so-called "confidential customer list," whether marked as such or generally understood as a confidential list. FIB is a financial institution, open to the public, where depositors and borrowers come and go in an open environment. Certainly, account and financial information about FIB's customers is confidential, but that doesn't support the claim that all FIB customer identities are confidential. Indeed, Defendants provide evidence that some client identities are readily ascertainable by others. While FIB relies on cases which found that some customer lists are confidential, none of those cases present facts like this one.

Further, while FIB discusses its "sizable body of confidential and frequently sensitive business and customer information," and the efforts it takes to maintain secrecy and confidentiality, FIB lumps all information about customers into general phrases such as "business information" and "financial information." This is insufficient for the Court to find a triable issue of fact that the mere identities of these FIB customers were subject to reasonable measures of secrecy by FIB.

Finally, if identities were FIB's trade secrets, the Court agrees with Defendants that Defendants did not misappropriate this information. Newman was contacted by former customers, so she did not use remembered secrets for improper solicitation or any other misappropriation. The other three Defendants did not misappropriate the client identities by merely telling FIB customers that they had joined Glacier, or even by expressing an

23

interest in the opportunity to help FIB customers in the future.  As to Martinson's "list," FIB presents no evidence that contradicts Martinson's statement that the information beyond some of the names represented "potential" business, not confidential FIB loan amounts and terms.

Further, the Court would note that the communications Defendants had, whether elicited by them or others, did not constitute "solicitation" as that word is commonly understood.  Common, relevant definitions of "solicit" include "(a) to make a petition, to entreat; (b) to approach with a request or plea; (c) to urge (something, such as one's cause) strongly; … [and] (d) to try to obtain by usually urgent requests or pleas." *See* https://www.merriam-webster.com/dictionary/solicit (last visited July 13, 2022).  Not even Martinson's statement saying, "if we can help you at some point in the future, we'd love to have the opportunity" satisfies this definition. ECF 104, pp. 25-26.

Finally, as to the remaining intimate knowledge of customers' financial condition, circumstances, and business needs, FIB advances no evidence or argument about any disclosure or use of this intimate knowledge to solicit customers, or for any other unfair competitive advantage for Defendants or Glacier.  Certainly, customers know lender representatives have this intimate knowledge, and it is not unusual for customers in any sector to follow their friends and/or service providers, in part because of the providers' knowledge of customer needs.  It is unrealistic to expect customers to forget their service relationship with another, just as it is unrealistic to expect Defendants to forget the knowledge they gained with their former employer.  Had FIB wished to preclude Defendants from leaving to compete by taking employment with another financial

institution, FIB could have proposed an enforceable non-compete agreement. The Court will not recognize a nonexistent non-compete agreement under the guise of "remembered secrets."

The Court will next address each Defendant's actions in printing specific documents, with FIB's response and the Court's conclusions:

***Defendant Hubert***

FIB does not address the amortization schedule and security agreement for the loan Hubert personally made after FIB declined to extend credit to the customer. Thus, the Court agrees with Hubert that FIB is not the owner of these two documents for trade secret consideration. The third document is identified by Hubert as a loan approval form which Hubert said he printed because he was required to physically initial it to override a loan denial for that customer. By declaration, Hubert states he did not take, retain copies of, or use that document after he left FIB.

FIB argues Hubert's failure to respond to FIB's pre-litigation request to confirm he had not taken confidential information is circumstantial evidence that he did so. FIB argues this inference combined with all Defendants' suspicious, simultaneous departures create questions of fact sufficient for jury consideration. Hubert replies that circumstantial evidence is insufficient to rebut his sworn declaration, especially given that FIB did not locate the document through discovery from Hubert or Glacier and did not contradict or rebut Hubert's explanation for printing the document. FIB inspected all of Defendants' offices shortly after their departures (including Hubert's, ECF 106-19, Bruni Depo. at 111-

112) and found only one page in an unidentified office.  ECF 82 (Jensen Dec. ¶ 4(d)).[5]  But this is insufficient to raise a material fact dispute.  It is speculative whether the document was not found in Hubert's office because he'd taken it with him, had it discarded/shredded after its use in the loan approval, or someone with FIB discarded/shredded it before FIB gave instructions to inspect the offices and retain documents.[6]  Finally, Hubert argues that a response was provided to FIB on Hubert's behalf, so it is false to claim he did not fail to respond to FIB's pre-litigation demand letter. ECF 103-3.

Viewing the evidence in the light most favorable to FIB, the Court agrees with Hubert that he has satisfied his burden for summary judgment on these statutory misappropriation claims, given that FIB has not brought forward specific facts showing a genuine issue for trial.   In short, FIB's suspicions, speculation and conjecture are insufficient to rebut Hubert's uncontradicted and plausible explanation for printing the loan approval form and his uncontradicted evidence that he did not take, disclose, or use the loan approval form after his departure.  Additionally, FIB received a response to its pre-litigation demand, so there is no appropriate adverse inference that documents were misappropriated.  Therefore, the Court will dismiss FIB's First and Second Claims for Relief as pled against Hubert.

### *Defendant Christensen*

Christensen states that 10 of the 17 documents she printed were FIB policies,

---

[5] None of the materials FIB cites regarding the office inspections state when they occurred, other than "shortly after" Defendants departed.  FIB's response suggests that the single page was in Newman's office, but cites only the Jensen Declaration in support.  ECF 104, p. 15.
[6] The same is true as to each Defendant.

guidelines or tutorials that did not mention any FIB customers.  She explained it was her practice to print policies and guidelines, which had been recently updated, and that she wanted the tutorials to help her loan processors to become credit analysts with FIB.  Two other documents were printed to ensure the spreadsheet she used for tracking letters of credit on FIB's system was updated.  Another document was a loan approval form needed to complete a loan commitment letter for the SBA on behalf of FIB.  The loan closed and remained at FIB.  The remaining printed documents (whether by Christensen herself or by Defendant Phelps at Christensen's request) all related to Bighorn Airways.  According to Christensen, these printed documents were needed for scanning into Director (FIB's electronic loan file system), to ensure that Bighorn Airways' loan files were complete in preparation for a credit review.  By sworn declaration, Christensen stated all documents were shredded before she left FIB, and that she did not retain, take, or use the documents at Glacier.

In response, FIB argues virtually all documentation associated with a credit review is digitized and FIB does not ask or expect any documents in printed form, and all review and analysis is online so credit examiners would have no reason to request or require printed documents.  All loan-related documents are stored in Director.  As to the two documents printed to ensure the spreadsheet used for tracking letters of credit were updated, FIB states the spreadsheet was not brought current when Christensen left.  As to the loan approval form needed for a loan commitment letter for the SBA, FIB reviewed Director and Christensen did not issue a loan commitment letter.  FIB states the Bighorn

Airways documents were not, as Christensen claims, entered into Director and that Bighorn Airways was not in a credit review.

In reply, Christensen states the Bighorn Airways documents were not printed until the last business day she was at FIB; thus, it is unsurprising that the scanning may not have been completed before she left. She also states the contract tracking spreadsheet was not part of the loan file, so it is not in Director but rather in a separate shared drive. In addressing the loan approval form needed to complete the loan commitment letter, Christensen states that this, too, was one of the last things she did before her resignation, and the loan file may not have been updated by someone else. Finally, Christensen argues that FIB has found no documents through discovery from her or from Glacier, and that FIB's investigation after her departure did not include any search of the shredder bins, which is what she used to discard the documents she printed.

FIB does not address the FIB policies, guidelines, or tutorials other than to generally state that FIB does not ask or expect any documents to be printed and to argue that other states have found underwriting guidelines, business plans and marketing strategies to be trade secrets. FIB offers no evidence that the FIB policies, guidelines, and tutorials contain such sensitive business plans, strategies, or determinations. Without more than generalities, the Court concludes these documents are not trade secrets misappropriated by Christensen.

Turning to the remaining documents at issue and viewing the evidence in the light most favorable to FIB, the Court agrees with Christensen that she has satisfied her burden for summary judgment on these statutory misappropriation claims. FIB has not brought

forward specific facts showing a genuine issue for trial. FIB's generalized statements that it doesn't ask or expect documents to be printed does not rebut Christensen's plausible explanations for why these documents were printed. FIB's evidence and arguments attempt to contradict Christensen's explanation for why the documents were printed, in an effort to argue these contradictions and the mass resignations are circumstantial evidence that the documents weren't printed for Christensen's work for FIB, but rather to disclose and/or use the documents for Glacier's benefit. However, FIB has no evidence that the documents were taken, let alone disclosed and used for Glacier's benefit. Even if the documents weren't needed or ultimately used to update or complete other documents, or to upload into Director, which the Court does <u>not</u> conclude, FIB has absolutely no evidence beyond its suspicions, speculation, and conjecture to show they were disclosed to Glacier or used for Glacier's benefit, or to contradict Christensen's evidence to the contrary. No reasonable jury could find in FIB's favor on the facts it has presented. Therefore, the Court will dismiss FIB's First and Second Claims for Relief as pled against Christensen.

### *Defendant McComb*

McComb printed a copy of a Meeting Agenda which included action items from a market level team call. He explains that this was printed for his reference and left in his FIB office. The second printed document was a set of notes from a conference, which he used to develop a PowerPoint for a FIB leadership team presentation. McComb left that document in his office. ECF 96, pp. 8-9. FIB does not specifically address these two documents, and otherwise does not identify trade secrets which McComb acquired by improper means, or which McComb disclosed to Glacier or used for Glacier's benefit.

29

Therefore, the Court will dismiss FIB's First and Second Claims for Relief as pled against McComb.

### Defendant Martinson

Martinson printed two spreadsheet reports listing notes that were maturing or that were past due, which was his common practice for review, tracking and follow-up with customers.  By sworn declaration, Martinson states all other ten documents were printed because they required physical signatures. ECF 95, p. 8.  According to Martinson, none of the documents related to customers who left FIB for Glacier.  He states he did not take any documents with him when he left FIB or use any FIB confidential information or trade secrets in his work for Glacier. *Id*.

FIB responds stating FIB's customary business practices do not require physical signatures as these forms can be approved electronically.  As to one form (Waiver, Amendments and Modification ("WAM") form), FIB argues Martinson never followed up on this while he was an FIB employee, and that the client was not on FIB's "pull" list which identifies loans that will be the subject of review.  ECF 104, pp. 13-14.  Another document was a personal financial statement ("PFS") for FIB clients, and FIB states there was no signed PFS from the clients in Director and these clients also were not on the "pull" list.  Further, FIB states another document which Martinson states he printed, signed, and gave to the title company was also not in Director. ECF 104, p. 14.  Finally, FIB argues that Martinson solicited clients from the list he compiled which reflected FIB loan terms, which contradicts Martinson's testimony that he did not use FIB confidential/trade secret information for his work with Glacier.

Martinson replies to say that FIB's response creates no disputed issue of fact as it was common for FIB employees to print documents in connection with their work duties, and FIB provides no evidence to dispute Martinson's testimony that he did not take or otherwise retain any of the printed documents or use them for his work at Glacier or against FIB's interests or disclose them to a third party. Further, Martinson never stated he printed documents for a credit review, so it doesn't matter that the clients weren't on FIB's "pull" list. Martinson also states he is not responsible for recordkeeping errors related to documents that FIB could not locate in Director, and the document he printed and signed was given to the title company, so Martinson did not testify that it was scanned into Director. Finally, Martinson states several companies and individuals he contacted were not FIB clients, that he knew nearly all of them personally outside his work for FIB, and that the list did not reflect FIB loan terms but represented Martinson's estimations of those customers' *potential* business. ECF 117, pp. 5-6.

Viewing the evidence in the light most favorable to FIB, the Court agrees with Martinson that FIB's response creates no disputed issue of fact as it fails to contradict Martinson's explanation for why documents were printed for his work at FIB and gives rise to no dispute or inference relating to any improper acquisition or misappropriation of trade secrets. As the Court has previously addressed Martinson's "list" and the alleged solicitation, the Court will not discuss that argument further other than to conclude that it also fails to create a disputed issue of fact for the jury as to misappropriation of trade secrets. Therefore, the Court will dismiss FIB's First and Second Claims for Relief as pled against Martinson.

***Defendant Dick***

In the 85 documents FIB claims Defendants printed shortly before they left FIB, FIB lists 9 documents that Dick allegedly printed.  By sworn declaration, Dick states with one exception, he did not bring any of those documents or any other confidential FIB document with him or retain copies when he left FIB. ECF 93, p. 7.  Dick further states none of the documents mentioned a customer that left FIB for Glacier. *Id*.  The one exception of a printed document he took was a cash conversion cycle worksheet that he created after removing client-identifying information before printing.  Dick states he destroyed that printed document as requested by FIB's counsel in the pre-litigation demand. *Id*.  Dick argues none of the documents he allegedly printed contain FIB trade secrets, and FIB has no evidence he misappropriated any of the documents.

FIB addresses three documents it claims Dick printed shortly before he left FIB – a FYE Covenant Check which Dick claimed he printed to sign a letter to go to the client for signature so it could be scanned into the system; a WAM form which Dick claimed he printed to sign and then scan; and the worksheet discussed above.  FIB states no letter, form or spreadsheet were found in Director.  As to the worksheet, FIB argues the explanation of why Dick printed the worksheet (to keep the math compilations and hidden text) is inconsistent with how Excel functions as the printed document does not provide data or formulas. ECF 104, pp. 14-15, 19.

By reply, Dick argues the WAM form is not on the list of allegedly trade secret documents that FIB claims Dick misappropriated, and he is not responsible for any recordkeeping error in scanning the document into Director.  Dick also argues FIB's

response to his statement of facts does not undermine or contradict his stated, legitimate reasons for printing the documents.  As to the worksheet, Dick states the document would not have been uploaded to Director because it was not part of the loan file.  Further, because Dick personally created the worksheet, he would have understood the relationship between the numbers without an electronic copy that reveals underlying formulas and data.

Without addressing the issue of whether any evidence exists to show that the documents are trade secrets, the Court agrees with Dick that FIB offers no evidence to show improper acquisition or misappropriation. Therefore, the Court will dismiss FIB's First and Second Claims for Relief as pled against Dick.

### *Defendant Newman*

FIB claims Newman printed five documents shortly before she left FIB.  By sworn declaration, Newman states two of the documents were spreadsheet reports listing notes that were maturing within 120 days.  Newman states it was her regular practice to print these reports to make notes, highlight, and document conversations as she worked on loan renewals.  She states one of the documents printed was a list of loans, which she printed to annotate the appropriate points of contact for the loans to benefit her successor at FIB. Newman states she left this on her back credenza in the FIB office.  Another document was a Paycheck Protection Program application form which was printed for an FIB client to review and make updates to complete the application.  The last document was printed for an FIB customer for his use in creating an updated personal financial statement for a new loan request, which FIB ultimately denied.  She states that she did not take or use any of the documents, or any other document after she left FIB. ECF 97, pp. 7-8.  Newman argues

FIB has no evidence showing that any of the documents she printed contain trade secrets, and FIB has no evidence showing misuse or misappropriation.

FIB contests Newman's declaration by stating the individual financial statement for the new loan request is contested because a loan was never sent to FIB for credit approval or processing.  As to the list of loans printed for annotation, FIB contests this fact stating there was no need to print this type of list as the information was available on Director and other FIB databases and, with one exception, no documents were left on the credenza. As with Martinson, FIB argues the timing of the decision to print these documents gives rise to reasonable inferences about the legality or propriety of Newman's actions that must be resolved by a jury. Finally, FIB argues Newman solicited FIB customers after she left FIB. ECF 104, pp. 15-16.

By reply, Newman argues FIB does not contradict Newman's explanation for why these documents were printed, and FIB has no evidence of misuse or misappropriation.  As to the financial statement for a new loan request, Newman states the application was not sent to the standard credit approval queue, but to FIB's Commercial Lending Center, and was ultimately denied.  Newman also states the document was printed before she even knew about the possibility of a job at Glacier, thereby negating any nefarious inference. As to the spreadsheet containing a list of loans, Newman states this document may have been the one exception of documents found by FIB, and FIB never searched Newman's office. Finally, Newman states while the spreadsheet contains information in Director, she printed it to add her annotations, which were not obvious from the spreadsheet itself. Finally, Newman contests that she ever testified she solicited customers, but only told one customer

she left and who the customer should contact at FIB, and she had contact with another, not that she solicited business.  As to the other customers FIB lists, Newman states those customers sought her out, and Newman made no initial contact. ECF 119, pp. 4-5.

As with other Defendants, the Court agrees with Newman that FIB offers no evidence to show improper acquisition or misappropriation of trade secrets. FIB's arguments about an inference based on timing and solicitation are not persuasive given Newman's response, and the Court find this argument inadequate to create a material question of fact for the jury.  Therefore, the Court will dismiss FIB's First and Second Claims for Relief as pled against Newman.

### Defendant Phelps

FIB identified 37 documents that Phelps allegedly printed.  Phelps argues FIB's computer forensic expert was unable to correlate print log entries for 22 of the 37 documents that Phelps allegedly printed with any specific FIB confidential or proprietary documents. ECF 98, p. 6.  Further, Phelps states only one of the 15 remaining documents relates to a customer that left FIB for Glacier, and this document was printed two weeks before Phelps knew of the possibility of working for Glacier. *Id*.  Phelps addresses other documents as well, including floor plan inspection sheets, which she states were printed for use in conducting a physical inspection of the customer's inventory of automobiles in connection with a floor plan loan, and that this was part of her job duties.  She states paper copies were required because she had no laptop or other device to view the inventory list while at the dealership. Other documents were printed at the request of Christensen or Martinson, for signature, for easier review, or for credit review examination (Bighorn

Airways).  Other documents were printed in connection with disbursement requests on construction loans, to train another employee on processing construction loan draw requests, to complete a checklist and input a worksheet for scanning into FIB's system, to obtain lien waivers from contractors, and for customer signatures, review and/or correction, which was her regular practice.  Phelps stated she did not take or use any of the documents identified or any FIB confidential information. ECF 98, pp. 7-9.

In response to Phelp's statement of facts, FIB states that prior to leaving FIB, Phelps emailed FIB's confidential documents to her personal email account and could not explain why that email was sent.  FIB also states that Phelps could not recall the reason why she printed a promissory note for one customer or why she printed a Bighorn Airways balance sheet. ECF 104, p. 19.

In reply, Phelps argues FIB's response provides no evidence that any of the documents contain trade secrets, and no evidence to contradict Phelps' explanation for why documents were printed for her work at FIB or at the request of Christensen.  Finally, as to the statement that Phelps emailed FIB's confidential documents to her personal email account, Phelps argues that statement is false in that those documents are not confidential. Phelps states one document was a standard mortgage release form that had been prepared for recording in public property records, another was a list of fees associated with various public real estate or security filings, and the last was a recitation of standard language that would appear in various types of public UCC financing statements.  Phelps argues none of those documents are on the list of confidential, proprietary, or trade secret documents that FIB claims Phelps misappropriated, and none contain such information.

Viewing the evidence in the light most favorable to FIB, the Court agrees with Phelps that FIB offers no evidence to show improper acquisition or misappropriation of trade secrets. FIB's arguments about Phelps' deposition testimony are not evidence or inference of either improper acquisition or misappropriation of trade secrets for purpose of raising a material question of fact for the jury, and the Court agrees with Phelps that the documents sent by email do not contain confidential information, let alone trade secrets. Therefore, the Court will dismiss FIB's First and Second Claims for Relief as pled against Phelps.

## 2. Misappropriation-Based Tort Claims and Breach of Contract Claim (Fourth and Fifth Claims)

FIB brings a conversion claim against all Defendants as to the alleged misappropriation by Defendants of its information, including allegations that Defendants have used this information and refused to return it to FIB. ECF 1, p. 12.  FIB also brings a contract claim, alleging breach of its Code of Conduct. ECF 1, pp. 11-12.

Based on the same reasons discussed above for FIB's statutory claims, the Court concludes that FIB has presented no disputed issue of fact for the jury on the alleged misappropriation of FIB information.  On the alleged breach of FIB's Code of Conduct, that claim requires evidence that Defendants used confidential information for their personal gain or to compete with FIB, or that Defendants shared confidential information with someone or an entity who has no legitimate Company business need to know, or that Defendants forwarded confidential information to personal email accounts.  For the same reasons discussed above, the Court concludes FIB has presented no disputed issue of fact

37

for the jury on the allegation that Defendants shared or used confidential information contrary to the Code of Conduct.

Finally, the only Defendant who forwarded any document to a personal email account was Defendant Phelps.  The Court agrees with Phelps that FIB fails to show a disputed issue of fact concerning Phelps' testimony that the documents did not contain confidential information. Based on Phelps' uncontradicted testimony, the documents did not contain information "about [FIB] clients, employees, business partners and others" which is required to satisfy FIB's definition of confidential information in its Code of Conduct. ECF 1-1, p. 14.

### 3. Breach of Duty of Loyalty (Claim Three)

FIB alleges breach of duty of loyalty against Defendants Hubert, McComb, Christensen and Martinson, claiming each of these Defendants were officers of FIB who exercised substantial responsibility for the operations of either the commercial banking unit or the home loans unit of FIB, and thus owes a duty of loyalty to FIB which they breached by together and individually orchestrating the mass departure from FIB to further Glacier's business interests.[7]  ECF 1, pp. 10-11.

Seeking judgment in their favor, Defendants argue they were at-will employees which weighs against finding any duty, and FIB has no evidence that their simultaneous departures had any substantial impact on FIB operations beyond the impact that

---

[7] FIB also include allegations against these Defendants that they used confidential customer lists to solicit business for Glacier.  The Court has previously addressed these allegations and rejected them on the basis that FIB has failed to create any dispute of fact that these Defendants misappropriated trade secrets, improperly disclosed confidential information, or solicited FIB clients.

Defendants' individual departures would have had, and because the employees brought in to replace them earned no additional salary beyond what would have otherwise been paid by FIB.  Further Defendants argue FIB can present no evidence that they lost any business due to a lack of personnel available to service customers.  Finally, Defendants argue there was no recruitment of others to leave as the evidence is undisputed that each Defendant had his or her personal reasons for leaving FIB, from dissatisfaction to salary increases and improved quality of life.

In response, FIB argues these Defendants seek to impose additional elements for a breach of duty of loyalty claim that are not required under Wyoming law, and that this Court has previously held that an employer has a viable claim if its employees "agree to leave their employment simultaneously and without giving the employer an opportunity to hire and train replacements." According to FIB, that is precisely what these Defendants did. ECF 104, p. 32.  Further, FIB states it suffered real harm from Defendants' orchestrated departure because FIB lost customers "due to the impairment of FIB's ability to provide a reliable and efficient transition to a new or another FIB employee who was conversant with the business needs and financial condition of the customer." *Id*., p. 33.  FIB argues other conduct which it claims shows an intent to injure FIB including: (1) the orchestrated, simultaneous resignation of key employees of an FIB branch without any advance notice; (2) the recruitment of other employees to join Glacier, the information provided to Glacier about employees under their supervision who were available to be recruited, and the failure to dissuade the employees they supervised from seeking employment with Glacier; (3) the lies (and failure to inform FIB) about Glacier's efforts to recruit FIB's employees; and (4)

the assistance provided to Glacier in finding a suitable location during their employment with FIB.[8]

In reply, these Defendants argue there is no evidence that any FIB employees were "solicited" or "recruited" to leave FIB for Glacier, and that the evidence merely shows they were aware of and discussed this opportunity among themselves. ECF 114, p. 9.  Further, there is no evidence of loss of customers, and no duty for Defendants to affirmatively disclose their own or anyone else's consideration of job opportunities at Glacier.

As to the law governing this duty of loyalty, in addition to other cases, all parties argue the *Restatement (2d) of Agency* § 393, comment (e) and this Court's order in *Balfour Beatty Infrastructure Inc. v. American Track Generations LLC*, 533 F. Supp. 3d 1030 (D. Wyo. 2020):

> *e. Preparation for competition after termination of agency.* After the termination of his agency, in the absence of a restrictive agreement, the agent can properly compete with his principal as to matters for which he has been employed. See § 396. Even before the termination of the agency, he is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein. Thus, before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete. He is not, however, entitled to solicit customers for such rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business.
>
> The limits of proper conduct with reference to securing the services of fellow employees are not well marked. An employee is subject to liability if, before or after leaving the employment, he causes fellow employees to break their contracts with the employer. On the other hand, it is normally permissible for employees of a firm, or for some of its partners, to agree among themselves, while still employed, that they will engage in competition with the firm at

---

[8] FIB also discusses the disclosure of confidential information and misappropriation of trade secrets as additional conduct, which the Court has addressed above and will not include in this list.

> the end of the period specified in their employment contracts. However, a court may find that it is a breach of duty for a number of the key officers or employees to agree to leave their employment simultaneously and without giving the employer an opportunity to hire and train replacements.

*Id*. at 1035-36 (citing *Restatement (2d) of Agency* § 393, comment (e)).

In first addressing the *Balfour Beatty* case, the Court's order decided a motion to dismiss, not a summary judgment motion. Further, the Court denied Defendants' motion because Plaintiff's allegations went beyond lawful preparations to compete, including allegations of the use of confidential information, the delay of customer business until after Defendants' departure with the intent to take Plaintiff's customers, and the recruitment of Plaintiff's employees.

In considering the arguments made by the parties, the Court agrees with Defendants that they had no duty to inform FIB about Glacier's efforts to recruit them or others, and they had no duty to dissuade the employees they supervised from seeking employment with Glacier. While FIB argues Defendants lied about Glacier's efforts to recruit them or others, Defendants had no duty to volunteer this information. *See Abraham Zion Corp. v. Lebow*, 593 F. Supp. 551, 571 (S.D.N.Y. 1984), *aff'd*, 761 F.2d 93 (2d Cir. 1985) (citation omitted) ("employees were under no duty to notify their employer of their plans and preparations [to compete] since to have done so would have made the right to engage in such conduct meaningless"); *White Cap. Indus., Inc. v. Ruppert*, 67 P.3d 318, 319-320 (Nev. 2003) ("since an employee does not breach his duty of loyalty by making preparations to compete, a fellow employee does not breach his duty of loyalty by failing to disclose his knowledge of this fact"). Further, it appears as though only Hubert was asked whether FIB was at risk

of losing employees, and Hubert admits he did not tell his supervisor Bruni that he and others were engaged in discussions with Glacier.  However, it is uncontradicted that both Bruni and Destefano knew from Hubert's statements or otherwise that the commercial team was unhappy and FIB had a risk of turnover. Again, Hubert had no duty to say more than he did.

Further, FIB provides no law suggesting Defendants had any duty to refuse to discuss with Glacier the names of FIB at-will employees under their supervision who may be interested in job opportunities with Glacier.  As to looking for a suitable site for Glacier's bank, this falls within the proper scope of conduct for employees who are preparing to leave, and FIB identifies no case to the contrary.  *See Auxton Comput. Enter., Inc. v. Parker*, 416 A.2d 952, 955 (N.J. Super. 1980) (an employee who is not bound by a covenant not to compete and who doesn't solicit his employer's customers or do other similar acts in direct competition with his employer's business, "may, while still employed, make arrangements for some new employment by a competitor or the establishment of his own business in competition with his employer").

As to the conclusory claims that these Defendants "recruited" or "solicited" others to resign, FIB advances no evidence to support such a claim and Defendants have testified to the contrary.  Further, even assuming some evidence supports an inference of recruitment or solicitation, FIB provides no authority applicable to an at-will employment situation which found a breach of the duty of loyalty based on this allegation, and the cases interpreting the *Restatement* suggest employees can cause their fellow employees to leave

employment provided that the recruited employee does not break their contracts with the employer.

As noted, all Defendants were at-will employees and there was no contract to "break." Indeed, the *Restatement* provides that it is normally permissible for employees to agree among themselves, while still employed, that they will engage in competition before they quit work and leave together for another employer. *See Quality Sys., Inc. v. Marman*, 132 F. Supp. 2d 349, 354 (D. Md. 2001) (no breach of duty by a manager and employees in the manager's circle to discuss joint employment opportunities and resolve to leave together); *Cudahy Co. v. Am. Labs., Inc*., 313 F. Supp. 1339, 1346-1347 (D. Neb. 1970) (no breach by making plans to set up competing corporation which still employed by plaintiff, and notifying plaintiff's customers of their intention); *USI Ins. Servs. Nat'l, Inc. v. Ogden*, 371 F. Supp. 3d 886, 898-99 (W.D. Wash. 2019) (no breach when husband and wife coordinated their departure from the company together).

This leaves FIB's last basis for this claim, namely that these four key officers agreed to leave their employment simultaneously and without giving FIB an opportunity to hire and train replacements. For the following reasons, the Court concludes there are sufficient genuine issues of fact for this basis of Claim Three to survive summary judgment as to Defendants Hubert, Christensen, and Martinson, but not as to Defendant McComb.

First, there is no dispute that all four Defendants were key FIB officers who left their employment on the same day and without giving FIB an opportunity to hire and train replacements. Defendants Hubert, Christensen and Martinson were present at the meeting in Hubert's home along with Dick, Newman, and Phelps who were also members of the

Commercial Lending Group.  During that meeting, Hubert and Christensen said they believed FIB intended to terminate them the next day and stated that they decided to submit their resignations the next day.

Considering the evidence in the light most favorable to FIB, this can be viewed as agreeing to leave their FIB employment simultaneously even if their individual reasons for leaving differed.  Further, these three key officers knew the decision to leave on the same day would not afford FIB an opportunity to hire and train replacements for the Commercial Lending Group.  The three key officers also knew that those present in Hubert's home that day constituted nearly all of the Sheridan branch's commercial lending team.  These Defendants do not dispute that they were "a strong, coherent group, and the group had greater value as a team than individually." ECF 104, p. 33.  Because virtually everyone in the Commercial Lending Group present at the meeting had either voiced an intent to resign or should have known the members would resign on Monday,[9] these three officers could reasonably foresee that all resignations on the same day and without notice would impact if not hamstring that lending group's ability to continue functioning at an optimum level, at least in the short term, in order to address commercial customers' banking needs.  The Court views these facts as sufficient for the issue of breach of duty to go to the jury as to Hubert, Christensen, and Martinson.

---

[9] From the fact that Hubert and Christensen openly expressed their belief that they would be fired and had decided to resign Monday, it appears reasonably foreseeable that these statements could influence the timing of the resignations of the other members of the Commercial Lending Group – Martinson, Dick, Newman, and Phelps.  With this observation, the Court also notes Phelps' statement that, before the meeting in Hubert's home, she had already decided to resign that Monday.

As to McComb, while he was a key officer, he was not at the meeting in Hubert's home, he was in a separate reporting line from the Commercial Lending Group, and his decision to resign would not affect the strong, coherent commercial lending team. Further, while presumably McComb had value to FIB as an officer and employee, as an individual he lacked the "greater value" of a strong, coherent group, and his Home Loans Group would still remain intact following his departure. In short, FIB provides no evidence to contradict the point that McComb's resignation would have the same impact on FIB whether it occurred on March 22 or any other day, in terms of suggesting evidence of a unique impact beyond just an individual officer's resignation. Had FIB desired a specific term for McComb's employment, which would have given FIB protection against his resignation at any time, FIB could have proposed such a contractual relationship with McComb rather than an at-will employment situation. Therefore, the Court will dismiss Claim Three as to Defendant McComb.

### 4. Tortious Interference with FIB's Contractual Relations (Claim Six)

FIB alleges Defendants used misappropriated information about two if not more important customers of FIB in their new positions at Glacier to compete with FIB for those customers' banking needs. FIB alleges Defendants attempted to induce those customers to borrow from Glacier and terminate their business relationship with FIB or reduce the scope of that relationship. FIB also alleges Defendants made misrepresentations to FIB clients and business partners that FIB is being sold or leaving the market, to interfere with FIB's economic relationships. ECF 1, pp. 12-13.

Seeking judgment in their favor, Defendants argue they merely engaged in legitimate competition and FIB has no admissible evidence that they engaged in any improper means to interfere with FIB's existing or prospective business relations. *See Wilder v. Cody Country Chamber of Com.*, 868 P.2d 211, 225 (Wyo. 1994) ("legitimate competition does not result in intentional interference with prospective contractual relations"). As to Christensen specifically, she states that she told Bighorn Airways a true fact at the time, that FIB would likely not provide "speculative" aircraft loans, which is exactly what FIB's credit officer told her. Further, Christensen states FIB offered Bighorn Airways improved loan terms and financing before the company changed lenders, and Bighorn Airways still decided to change. ECF 92, p. 25.

In response, FIB argues it has submitted evidence showing that Defendants misappropriated FIB's confidential information. Having found that FIB has not presented triable issues of fact precluding summary judgment on FIB's statutory and tort-based misappropriation claims, this basis will not support a claim against Defendants for tortious interference. FIB argues no other basis in support of this claim against Defendants. Therefore, the Court will dismiss FIB's Sixth Claim for Relief.

<u>Conclusion</u>

For the foregoing reasons, the Court finds and concludes that there are no triable issues of fact precluding summary judgment as to any claims pled by Plaintiffs against Defendants with the exception of the Third Claim for Relief, Breach of Duty of Loyalty Against Defendants Hubert, Christensen, and Martinson. Accordingly, the Court hereby Orders that:

Defendant Hubert's Motion for Summary Judgment (ECF 87) is GRANTED IN PART AND DENIED IN PART and all Claims for Relief are DISMISSED except the Third Claim for Relief – Breach of Duty of Loyalty; and

Defendant Christensen's Motion for Summary Judgment (ECF 85) is GRANTED IN PART AND DENIED IN PART and all Claims for Relief are DISMISSED except the Third Claim for Relief – Breach of Duty of Loyalty; and

Defendant Martinson's Motion for Summary Judgment (ECF 88) is GRANTED IN PART AND DENIED IN PART and all Claims for Relief are DISMISSED except the Third Claim for Relief – Breach of Duty of Loyalty; and

Defendant Dick's Motion for Summary Judgment (ECF 86) is GRANTED, and he is DISMISSED; and

Defendant McComb's Motion for Summary Judgment (ECF 89) is GRANTED, and he is DISMISSED; and

Defendant Newman's Motion for Summary Judgment (ECF 90) is GRANTED, and she is DISMISSED; and

Defendant Phelps' Motion for Summary Judgment (ECF 91) is GRANTED, and she is DISMISSED.

Dated this 15th day of July, 2022.


_NANCY D. FREUDENTHAL_
NANCY D. FREUDENTHAL
UNITED STATES SENIOR DISTRICT JUDGE