**STUART R. DAY**, WSB #5-2244
sday@wpdn.net
**SCOTT E. ORTIZ**, WSB #5-2550
sortiz@wpdn.net
Williams, Porter, Day & Neville, P.C.
159 North Wolcott, Suite 400 (82601)
P. O. Box 10700
Casper, WY 82602
Telephone: 307-265-0700
Facsimile: 307-266-2306

**PETER HAWKES**, OSB No. 071986 (*pro hac vice*)
peter@angelilaw.com
**TYLER P. FRANCIS**, OSB No. 162519 (*pro hac vice*)
tyler@angelilaw.com
**EDWARD A. PIPER**, OSB No. 141609 (*pro hac vice*)
ed@angelilaw.com
ANGELI LAW GROUP LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| FIRST INTERSTATE BANCSYSTEM, INC. and FIRST INTERSTATE BANK,<br><br>          Plaintiffs,<br><br>    vs.<br><br>DAVID HUBERT, NICOLE CHRISTENSEN, DONOVAN MCCOMB, JAY MARTINSON, JOHN DICK, KIMBERLEE NEWMAN, and MYRIAH PHELPS,<br><br>        Defendants. | Case No. 21-cv-67-NDF<br><br>**DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' DAMAGES EXPERT** |

Pursuant to Fed. R. Evid. 104(a), Fed. R. Evid. 401, Fed. R. Evid. 403, Fed. R. Evid. 702, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Defendants move to exclude the proposed testimony of Plaintiffs' damages expert, William N. Holmes, CPA/ABV/CVA/CFE, in its entirety.

PAGE 1 – DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS'
      DAMAGES EXPERT

**Certificate of Good Faith Conference**

Pursuant to Local Rule 7.1(b)(1)(A), counsel for Defendants certify that they met and conferred with counsel for Plaintiffs at a personal conference regarding the relief requested in this motion, but the parties were unable to resolve the dispute.

## I.      INTRODUCTION

It goes without saying that "all expert testimony must be relevant." *Hedquist v. Walsh*, Civ. No. 16-CV-265-J, 2018 WL 11251342, at *5 (D. Wyo. Mar. 15, 2018). Even before considering its reliability, the proposed expert opinion testimony of Plaintiffs' damages expert, William Holmes, as set forth in his Amended Expert Report dated April 15, 2022 (ECF No. 76) ("Report") and his Supplemental Expert Report dated November 21, 2022 (ECF No. 161) ("Supp. Report"), fails to meet even that more basic threshold. There is no evidence that the lost interest income and excess marketing expenses Plaintiffs allegedly incurred were caused by Defendants' alleged breach of their duty of loyalty. And Plaintiffs' allegedly "excess" salary expenses cannot even be considered damages, as they resulted in no out-of-pocket loss to Plaintiffs. Plaintiffs no longer have a legal (or factual) theory upon which to recover any alleged "unjust enrichment." Finally, other than the lost interest income, all of Plaintiffs' alleged damages could be easily calculated by a third-grader, and thus do not require expert testimony.

Further, even if it were relevant—and it is not—Holmes's calculation of alleged lost interest income is unreliable. First, Holmes's calculation improperly relies on an unsupportable discount rate. Second, Holmes's lost calculation also assumes—without reasonable justification—that 10 of the 33 loans he analyzes would continue to generate interest income *after* their stated maturity date. Both of those errors vastly inflate the purported lost revenues.

For all of those reasons, Holmes's testimony should be excluded in its entirety.

## II.   ARGUMENT

Rule 702 specifies that expert witness testimony is admissible only "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Under *Daubert*, the Court must conduct a two-step inquiry to determine admissibility under that rule. First, the Court must find that the expert testimony is *relevant*, *i.e.*, that it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert*, 509 U.S. at 591). Second, the Court must be satisfied that the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221-22 (10th Cir. 2003) (citations omitted). "This gatekeeper function requires the judge to assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Id*. at 1221.

### A.   Holmes's Proposed Expert Testimony Is Irrelevant.

#### 1.   The lost interest income Holmes purports to calculate has no causal connection to Plaintiffs' sole remaining theory of liability.

Plaintiffs propose to have Holmes testify concerning millions of dollars in alleged lost interest income from customers who terminated their banking relationships with First Interstate Bank ("FIB") and moved to Glacier Bank. (*See* Supp. Report at 2, 5-6.) But those lost revenues have no discernable causal relationship to the sole remaining claim in this case: certain Defendants' alleged breach of their duty of loyalty by allegedly agreeing to leave their employment with Plaintiffs simultaneously and without giving Plaintiffs an opportunity to hire and train replacements. (*See* ECF No. 147 at 38-45.) It is elementary that tort damages for an agent's breach of duty to a principal are limited to losses caused by the alleged breach. *See*, *e.g.*,

*Kirkwood v. Kelly*, 794 P.2d 891, 893 (Wyo. 1990) (affirming summary judgment in favor of defendants where "there is no evidence to indicate any causal connection between the alleged breach [of fiduciary duty] and the alleged damages"); Restatement (Second) of Agency, § 401 & cmt. b (1958). Holmes's testimony concerning alleged lost revenues is therefore irrelevant.

There is no evidence that any of the customers at issue terminated its banking relationship with Plaintiffs as a result of Plaintiffs' lack of staffing. The best Plaintiffs have been able to come up with is rank hearsay from FIB Sheridan Market President Steven Crow, who signed a summary judgment declaration stating that he "understand[s] that some FIB customers at Sheridan ended their commercial banking relationship with FIB due to the impairment of FIB's ability to provide a reliable and efficient transition to a new or another FIB employee who was conversant with the business needs and financial condition of the customer." (ECF No. 107, ¶ 5.) Crow, however, did not specifically identify any such customers, nor did he explain the basis for his "understanding." FIB's Chief Banking Officer, Russell Lee, testified that he did not know whether FIB lost any customers in Sheridan because they could not be serviced during the transition period. (Hawkes Decl. Ex. 1, Lee Dep. Tr. 63:20-24, 64:15-65:8.)

To the contrary, the evidence shows that Plaintiffs ensured that *there was no staffing shortage* by bringing in employees from other branches. David Bruni, FIB's then-Regional President, testified that he immediately brought in experienced lenders from other markets to "pinch-hit" for Defendants after their departure. (Hawkes Decl. Ex. 2, Bruni Dep. Tr. 96:6-97:7.) Those lenders "executed on deals that were partially done" and "met with and reassured clients…" (*Id.*) Bruni characterized this effort as "proactive" and said that it "pa[id] dividends." (*Id.*) Bruni said FIB's commercial customers were "perfectly content working with a replacement." (*Id.* at 105:15-106:11.)

In *McGinchy v. Shell Chem. Co.*, 845 F.2d 802, 806 (9th Cir. 1988), the court excluded expert testimony concerning alleged lost profits where the expert "did not relate the loss to specific acts" of the defendants, finding that the expert's "report and testimony would pose a great danger of confusing the fact and cause of damages with the amount of damages." As the court explained, the expert's "study rests on unsupported assumptions and ignores distinctions crucial to arriving at a valid conclusion." *Id*. at 807. The same is true of Holmes's lost revenue analysis, which the Court should therefore exclude.

### 2. Holmes's testimony concerning other damage categories is likewise irrelevant.

For the same reasons, Holmes's proposed testimony concerning alleged excess marketing expenses, alleged unjust enrichment, and alleged internal salary expenses is also irrelevant. There is no evidence whatsoever that Plaintiffs incurred any marketing expenses in an effort to mitigate customer concerns *about its lack of staffing*. To the contrary, the evidence suggests that those marketing expenses were largely incurred to combat the negative public reaction to Plaintiffs' poor decision to falsely accuse its former employees of stealing trade secrets. (*See*, *e.g.*, Hawkes Decl. Ex. 3.) Further, it was *only* on those now-dismissed trade secrets claims that Plaintiffs sought to recover for "unjust enrichment"—on their remaining tort claim, Plaintiffs seek recovery only for compensatory damages they claim to have suffered due to the alleged breach of the duty of loyalty, as well as punitive damages.[1] (Compl., ECF No. 1, at 13-14.) The "internal salary expenses" that Plaintiffs allegedly incurred in covering for Defendants' departures cannot be considered part of those compensatory damages either, because they resulted in no out-of-pocket loss to Plaintiffs, who would have paid the exact same amount of

---

[1] Moreover, even if Plaintiffs *had* alleged a right to recover "unjust enrichment" on their duty of loyalty claim, there is no evidence that Defendants' higher salaries at Glacier Bank are attributable to any breach of that duty. *See* Restatement (Second) of Agency, § 403.

salary to those employees regardless. (*See* Hawkes Decl. Ex. 1, Lee Dep. Tr. 62:2-63:19.) Awarding those "internal salary expenses" to Plaintiffs would amount to a windfall.

Holmes's proposed "expert" testimony concerning alleged excess marketing expenses, internal salary and travel costs, and unjust enrichment is also irrelevant because it will not assist the jury to understand the evidence. The schedules of the alleged "marketing expenses" and "travel expenses" consist of nothing more than lists that total those alleged expenses up through simple addition. (Supp. Report, Sch. 3-5, 7.) Similarly, Holmes calculates Defendants' alleged "unjust enrichment" through simple subtraction of their FIB salary from their current salary. (*Id*. Sch. 8.) The schedule of alleged "internal salary expenses" uses simple division to impute an "hourly rate" for each salaried employee, then totals up the "salary expense" by multiplying that hourly rate by the number of hours allegedly spent in "mitigation" activities. (*See id*. Sch. 6; Hawkes Decl. Ex. 4, Holmes Dep. Tr. 81:15-22.) This demonstration of elementary-school-level math is well "within the ken of a lay jury." *See U.S. Bank Nat'l Ass'n v. James*, 741 F.Supp.2d 337, 343 (D. Me. 2010); *cf. Frappied v. Affinity Gaming Black Hawk, LLC*, 996 F.3d 1038, 1057 (10th Cir. 2020) ("simple calculation…involv[ing] only basic arithmetic" constitutes "lay testimony"). "'Expert' testimony about matters of common sense is not helpful to a jury and carries the risk of unfair prejudice[.]" *U.S. Bank Nat'l Ass'n*, 741 F.Supp.2d at 343 (citation omitted). Plaintiffs' simple math can be "argue[d] to the jury in closing" and "does not need the imprimatur of an 'expert.'" *Id*.

### B. Holmes's Lost Interest Income Calculation Is Unreliable.

#### 1. Holmes's net present value discount rate is unsupportable.

The alleged lost interest income constitutes the lion's share of the alleged damages purportedly calculated in the expert report—some $3.64 million of the $3.79 million in total damages claimed. (*See* Supp. Report at 6, Table 1.) As Holmes explains, that $3.64 million

PAGE 6 – DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS'
        DAMAGES EXPERT

represents his calculation of the net present value ("NPV") of the total future interest income FIB

would have received if the loans had remained at FIB. (*Id*. at 4-5.) The discount rate Holmes

used to arrive at that NPV, however, is not based on any reliable methodology.

In his prior report, Holmes simply used—without explanation—the 20-year daily U.S.

Treasury rate of 2.23% as the discount rate. (*See* Report, Sch. 2.) That measure is commonly

known as the "risk-free" discount rate because 20-year Treasury bonds "are considered nearly

free of default risk because they are fully backed by the U.S. government." (ECF No. 62,

Rebuttal Expert Report of Jay Sickler, CPA, CFF, ABV, ASA ("Rebuttal Report"), at 12-13.) As

Defendants' rebuttal expert, Jay Sickler, explained, "the use of a risk-free discount rate in an

analysis such as this, is clearly inappropriate. The discount rate selected to perform a present

value calculation in this context must be commensurate with the riskiness of the income stream

being present valued." (Rebuttal Report at 8-9.) "Loans to banking customers . . . are riskier than

20-year treasury bonds because banking customers are not similarly backed by the U.S.

government and the risk of default is considerably higher." (*Id*. at 13.) Courts considering this

precise issue have agreed with Sickler's analysis and, pursuant to *Daubert*, have excluded

testimony from damages experts that inappropriately employed a risk-free discount rate. *See*,

*e.g.*, *Great Lakes Gas Transmission Ltd. P'ship v. Essar Steel Minn., LLC*, Civil No. 09–CV–

3037 (SRN/LIB), 2014 WL 12597430, at *24 (D. Minn. Mar. 11, 2014); *Kay v. First Continental

Trading, Inc.*, 976 F.Supp. 772, 776 (N.D. Ill. 1997).

In his new Supplemental Report, Holmes engages in revisionist history and sleight-of-

hand to justify his prior use of the risk-free rate. Holmes purports to "clarify" how and why he

selected the risk-free rate, explaining in detail how he purportedly "considered both the impact of

time value of money and the risk that the cash flows would not be received." (Supp. Report at 2,

4, 12-19.) As Sickler's Supplemental Rebuttal Report points out, *none* of that explanation appeared in Holmes's prior six-page report, suggesting that it is an after-the-fact justification reverse-engineered to address Sickler's criticism. (ECF No. 169 ("Supp. Rebuttal") at 9, 11.)

Indeed, that reverse-engineering is hidden in plain sight in Holmes's new report. Holmes admits that the discount rate must account for *both* the time value of money *and* the risk that the cash flows would not be received. (Supp. Report at 12.) Holmes calculates FIB's time value of money to be 1.36%. (*Id*. at 15.) Holmes then states that his prior selection of the risk-free rate "included a risk-rate premium of 0.87% for the risk that the cash flows would not be realized by FIB." (*Id*. at 17.) But Holmes never explains how he arrived at this percentage as the appropriate "risk-rate premium." (Supp. Rebuttal at 12-13.) In fact, it is obvious that Holmes arrived at this figure simply by subtracting the time value of money (1.36%) from the risk-free rate (2.23%). (*Id*.) In other words, Holmes's argument is circular: he *starts with the assumption* that the risk-free rate includes an appropriate "risk-rate premium" on top of the time value of money. That, of course, is nonsense: "A risk-free rate, by definition, cannot include risk." (Supp. Rebuttal at 14.)

Holmes attempts to justify his "risk-rate premium" by observing that it more than accounts for the expected losses due to default based on the charge-offs for FIB's total loan portfolio reported in its 10-K, leaving a buffer of $125,834 to account for early loan repayments. (Supp. Report at 15-17.) But Holmes's report fails to explain his assumption that the default risk on the specific loans at issue is comparable to FIB's entire portfolio. (Supp. Rebuttal at 16.) Likewise, Holmes's approach fails to account for the risk that any *specific* customer would refinance—which could dramatically impact the expected cash flows. (*See id*. at 14-15.)

Holmes then attempts to disguise the fact that his prior error continues to infect the calculation of his current discount rate, while further compounding the problem with new errors.

Holmes concedes that, due to interest rate increases, FIB's time value of money has increased. (Supp. Report at 24.) But Holmes's new time value rate of 3.83% "is derived contrary to how [Holmes] says it should have been determined in April." (Supp. Rebuttal at 13.) The April figure was based on FIB's actual rate of return on investment securities as reported in its 10-K, but the November figure is simply based on the federal overnight funds rate. (*Compare* Supp. Report at 12-15 *with id.* at 24.) Moreover, Holmes continues to use the prior "risk-rate premium" of 0.87%, even though that figure was calculated using the then-prevailing risk-free rate of 2.23%, not the risk-free rate of 4.14% that applied as of the date of his new report. (*Id.*; *see* https://home.treasury.gov/resource-center/data-chart-center/interest-rates/TextView?type=daily_treasury_long_term_rate&field_tdr_date_value=2022.) Simply put, Holmes freely mixes apples and oranges, without any justification in sound valuation principles for his methodology.

### 2. Holmes has no reliable basis for his assumption that loans would continue to generate interest income after maturity.

As explained in the Rebuttal Report, Holmes's analysis also assumes, "without providing a rationale, that 10 of the 33 loans at issue would have continued with FIB and paid the bank interest income, well past the maturity dates set out in the original loan documents." (Rebuttal Report at 8.) In some cases, Holmes assumed continued interest income for over *twenty years* after the stated loan maturity date. (*See id.* at 11-12, Table 2.) In total, the amount of interest income beyond maturity that Holmes includes in his analysis reaches nearly $2 million. (*Id.*)

Holmes makes no effort to justify his inclusion of that interest income in his new report. At his deposition, Holmes explained that some customers who moved their business from FIB to Glacier Bank were paying less than the stated amount on their loan documents, and he assumed that FIB would extend those loans so that those customers could continue making those lower payments until the loans were fully repaid. (Hawkes Decl. Ex. 4, Holmes Dep. Tr. 24:17-27:9.)

Holmes based that assumption, however, on nothing more than FIB's self-serving representation that (1) it would not demand full repayment upon the stated loan maturity; and (2) it would extend the loan at the *same interest rate* currently being charged, regardless of whether prevailing interest rates had increased. (*Id*. at 53:16-61:3.)

In *Sleepy's LLC v. Select Comfort Wholesale Corp.*, No. 07 CV 4018(TCP)(ARL), 2012 WL 441190, at *2-*3 (E.D.N.Y. Feb. 10, 2012), the court held that expert testimony regarding lost profit damages "beyond the expiration of the contract" based on an "assumption that [the agreement] would have been renewed" must be excluded as "speculative[.]" And numerous courts have excluded as unreliable purported expert testimony that relies on the untested, self-serving assumptions of an interested party. *See*, *e.g.*, *Vernon Walden, Inc. v. LIPOID GmbH*, No. Civ. 01–4826DRD, 2005 WL 3088333, at *11-*12 (D.N.J. Nov. 17, 2005) (damages calculations based on "the deposition testimony, estimates, feelings and beliefs" of an interested party were "speculative in the extreme" an inadmissible under *Daubert*); *Lava Trading, Inc. v. Hartford Fire Ins. Co.*, No. 03 Civ. 7037(PKC), 2005 WL 4684238, at *16 (S.D.N.Y. Apr. 11, 2005) (relying on a client's "guesses" based on a "sense" that they were "plausible" without a "meaningful inquiry into whether they had a basis in fact" is "inconsistent with the requirement that the expert use 'scientific' or 'professional methods.'") (citation omitted). Here, Holmes included interest income beyond the terms of FIB's loan agreements based on nothing more than FIB's self-serving representation that it would have extended those loans on the same terms indefinitely. Simply put, that is not a reliable methodology under *Daubert*.

### III.    CONCLUSION

For the foregoing reasons, Defendants' motion to exclude the testimony of William Holmes should be granted in its entirety.

DATED: January 31, 2023

Respectfully submitted,

**WILLIAMS, PORTER, DAY & NEVILLE, P.C.**

/s Stuart R. Day
STUART R. DAY, WSB #5-2244
SCOTT E. ORTIZ, WSB #5-2550

**ANGELI LAW GROUP LLC**

PETER HAWKES, OSB No. 071986 (*pro hac vice*)
TYLER P. FRANCIS, OSB No. 162519 (*pro hac vice*)
EDWARD A. PIPER, OSB No. 141609 (*pro hac vice*)

*Attorneys for Defendants*